# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | 3:16-cr-00001-RCJ-VPC |
| vs. | ) | |
| ALBERTO JULIO GUILLEN, | ) | **ORDER** |
| Defendant. | ) | |

A grand jury has indicted Defendant Alberto Guillen of being a felon in possession of a firearm.  Defendant has asked the Court to exclude all evidence obtained at his home, including the firearms themselves and statements made by Defendant and his roommate.

## I.    LEGAL STANDARDS

### A.    The Fourth Amendment and Exclusion Generally

Evidence obtained by the Government in violation of the Fourth Amendment is generally inadmissible against an accused in a federal criminal trial. *Weeks v. United States*, 232 U.S. 383, 393–99 (1914).  Before searching a defendant's home, the Government must obtain a search warrant based on probable cause and issued by a neutral and detached magistrate; warrantless home searches are presumptively unreasonable. *See* U.S. Const. amend. IV; *Payton v. New York*,

445 U.S. 573, 586 (1980).  The probable cause standard is familiar.  As stated by the Supreme

Court in the context of reviewing a magistrate's issuance of a warrant:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (quoting *Jones v. United States*, 362 U.S. 257,

271 (1960)).  Voluntary consent is an exception to the warrant requirement:

> A warrantless search is unconstitutional unless the government demonstrates that it "fall[s] within certain established and well-defined exceptions to the warrant clause." *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008) (quoting *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988)).  Consent constitutes one such exception: "[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).  The government bears the burden of proving that consent was voluntary. *Patayan Soriano*, 361 F.3d at 501.  Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.  We consider five factors in determining voluntariness:

> > (1) whether the [consenting individual] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the [consenting individual] was notified that she had a right not to consent; and (5) whether the [consenting individual] had been told a search warrant could be obtained.

> *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989)).  These factors serve merely as guideposts, "not [as] a mechanized formula to resolve the voluntariness inquiry." *Patayan Soriano*, 361 F.3d at 502.  Moreover, no one factor is determinative. *Id.*

> With respect to the first factor, a seizure occurs "when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)) (internal quotation marks omitted).  The Ninth

Circuit has identified five factors that aid in determining whether a person's liberty has been so restrained:

> (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter.

*Id.* (citing *Orhorhaghe v. INS*, 38 F.3d 488, 494-96 (9th Cir. 1994)).

*United States v. Brown*, 563 F.3d 410, 414-15 (9th Cir. 2009).  The scope of consent given is determined according to an objective reasonableness standard: "A suspect may of course delimit as he chooses the scope of the search to which he consents.  But if his consent would reasonably be understood to extend to [the place where a challenged item is found], the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Florida v. Jimeno*, 500 U.S. 248, 252 (1991).  Finally, "[t]he emergency doctrine allows law enforcement officers to enter and secure premises without a warrant when they are responding to a perceived emergency." *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005).

**B.**   *Miranda v. Arizona*

The Supreme Court has instituted a warning requirement as a prophylactic measure to protect against violations of the Fifth Amendment right against self-incrimination:

> [A defendant] must be warned prior to any questioning that [1] he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  An officer need not use any particular verbiage; the warning need only reasonably convey the substance of the four rights. *Florida v. Powell*, 559 U.S. 50, 60 (2010).  Moreover, the warning need only be read before "custodial interrogation." A person is "in custody" for the purposes of *Miranda* if a reasonable person under the circumstances would not feel free to leave. *See, e.g.*, *United States v. Medina-Villa*, 567 F.3d 507, 519 (9th Cir. 2009).  "Interrogation" for the purposes of *Miranda* means questions or comments that are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Volunteered statements that are not made in response to interrogation are admissible, however, even when a suspect is in custody and after he invokes his rights. *Klamert v. Cupp*, 437 F.2d 1153, 1154 (9th Cir. 1970) (citing *Miranda*, 384 U.S. at 478).

C.      **"Fruit of the Poisonous Tree"**

Any evidence obtained even indirectly as a result of a constitutional violation is "fruit of the poisonous tree" and should be excluded. *Nardone v. United States*, 308 U.S. 338, 341 (1939). There are three exceptions to this doctrine.  Evidence otherwise excludable as the fruit of a constitutional violation is admissible if: (1) obtained independently via means unrelated to the illegality, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); (2) the evidence would have been inevitably discovered through lawful means, *Nix v. Williams*, 467 U.S. 431, 448 (1984); or (3) the connection between the illegality and the challenged evidence has become sufficiently weak so as to dissipate the taint caused by the illegality, *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  Failures to adhere to the *Miranda* rule have no "fruit" because no constitutional violation occurs unless and until the offending statement is admitted against the defendant at trial. *Or v. Elstad*, 470 U.S. 298, 306–08 (1985); *see also Cooper v. Dupnik*, 924 F.2d 1520, 1527 (9th Cir. 1991).

## II.      DISCUSSION

Defendant alleges various constitutional violations.  The Court will examine the issues as the challenged events occurred chronologically.

### A.      Arrival at Defendant's Home and Initial Entrance

At approximately 3:40 a.m. on December 28, 2015, a witness called the Washoe County Sherriff's Office to report a man yelling and threatening someone's life in the area of 5830 Applegate Dr. (*See* Dispatch Log, ECF No. 22-1).  Deputies Brinson and Durbin were dispatched, and Deputy Brinson saw a man standing on the front porch of 5841 Applegate Dr. who identified himself as Defendant when the deputies approached. (*See* Brinson Police Report 1, ECF No. 18-1, at 3).[1]  Defendant told Deputy Brinson he had been yelling to "let off steam" and that his roommate was sleeping inside. (*Id.*).  Deputy Brinson told Defendant she needed to speak with the roommate to check his welfare.  (*Id.*).  Defendant agreed, led the deputies into the residence, knocked on his roommate's door, and said the police wanted to speak to him. (*Id.*).

The Court finds that all this activity was permitted as a welfare check.  Deputy Brinson had arrived knowing only that there had been a man screaming and making death threats.  This reasonably perceived emergency justified both Deputy Brinson's questions to Defendant concerning other persons at the scene and her warrantless entrance into the residence to confirm the roommate's safety, even assuming Defendant had not validly consented to the entry. *See Stafford*, 416 F.3d at 1073.

///

///

---

1 Deputy Brinson's partner, Deputy Durbin, wrote a shorter report that is consistent with Deputy Brinson's report. (*See* Durbin Police Report, ECF No. 18-1, at 6).

1

### B.      Deputies' Initial Conversations with Scott

2

Defendant's roommate Jesse Scott came out of the bedroom, stood in the hallway, and

3

gestured as though he wanted to speak in his bedroom where Defendant could not see. (*See*

4

Brinson Police Report 1).  He told the deputies he was alright but that Defendant was "crazy,"

5

and "hit [him] with a plastic stick," leaving a welt on his arm, which Deputy Brinson observed.

6

(*Id.*).  He declined medical attention but said he wanted to leave. (*Id.*).  Because Scott's

7

statements and Deputy Brinson's observations were not the fruit of any violation of Defendant's

8

rights, they need not be suppressed.

9

As the deputies escorted Scott to the front porch, Defendant began to yell at Scott and the

10

deputies to leave. (*Id.*).  Because Defendant was agitated, Deputy Brinson requested backup.

11

(*Id.*).  Deputy Brinson then positioned herself inside the residence so she could see both

12

Defendant (in the residence) and Scott (on the front porch). (*Id.* 1–2).  Deputy Brinson's

13

remaining in the residence without a warrant at this point did not violate Defendant's Fourth

14

Amendment rights despite Defendant's command for her to leave because there was an exigency

15

justifying Deputy Brinson positioning herself where she did, i.e., it reasonably appeared

16

Defendant had attacked Scott with a weapon (which had not yet been located and secured), and

17

he was still highly agitated. *See Stafford*, 416 F.3d at 1073.

18

Deputy Brinson then asked Defendant what had happened, and Defendant replied that

19

nothing had happened and argued that if anything had happened, he would have marks on his

20

arms and hands. (*See* Brinson Police Report 2).  The Court will not exclude these statements.  At

21

this point Defendant was not in custody for the purposes of *Miranda*, and Deputy Brinson had

22

the right to ask basic questions of those on the scene to sort out what had happened. *See*

23

24

1   *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978) ("on-the-scene questioning does not

2   require *Miranda* warnings").

3        Deputy Dunham then arrived and began speaking with Scott. (*Id.*).  Deputy Dunham

4   located Scott in the front yard and asked if he was okay. (Dunham Police Report 3, ECF No. 18-

5   1, at 9).  Scott, who was holding his left elbow in his right hand, mumbled something; when

6   Deputy Dunham repeated the question, Scott said he had been "beat to shit." (*Id.*).  Scott's left

7   hand was swollen, and Scott said he was injured. (*Id.*).  Deputy Dunham summoned REMSA (a

8   local ambulance service) to assess Scott. (*Id.*).  Deputy Brinson came out of the residence and

9   told Deputy Dunham that she and Deputy Durbin were inside talking to Defendant. (*Id.*).  Deputy

10  Rosa then arrived, and Deputy Dunham asked Deputy Rosa to attend to Scott while Deputy

11  Dunham went inside to speak to Defendant. (*Id.* at 3–4).

12       **C.    Deputies Dunham's and Durbin's Questions to Defendant**

13       As Deputy Dunham stood in the doorway, Defendant began to yell at him. (*Id.* at 4).

14  Deputy Dunham believed Defendant thought Deputy Dunham was Scott, because he began to

15  tell him he would lose everything and go back to prison. (*Id.*).  This statement is not excludable

16  under *Miranda* because it was not made in response to any question that was reasonable likely to

17  elicit an incriminating response, i.e., it was not the product of interrogation.

18       Deputy Dunham then entered and saw Defendant siting on a couch with Deputy Durbin

19  attempting to speak to him. (*Id.*).  Deputy Dunham asked Defendant what happened, and

20  Defendant replied that nothing had happened. (*Id.*).  Deputy Dunham asked Defendant if he had

21  fought with Scott, and Defendant denied it. (*Id.*).  Deputy Durbin told Deputy Dunham that

22  Defendant denied any altercation and refused to give any further information.  The Court will not

23  exclude these statements. *See Cervantes*, 589 F.2d at 427.

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### D.        Deputy Dunham's Further Conversation with Scott

Deputy Dunham went outside to speak with Scott again near the ambulance. (Dunham Police Report 4).  Scott told Deputy Dunham that he had been renting a room from Defendant for about 10 days, and Defendant had begun acting bizarre after several days, accusing Scott of sexually molesting his dog and wanting to rob Defendant. (*Id.*).  Earlier that night, Defendant had knocked on Scott's bedroom door. (*Id.*).  When Scott came out to speak with Defendant, Defendant accused Scott of feeding Defendant's dog. (*Id.*).  Scott denied it, and Defendant became upset, accusing him of wanting to steal from Defendant and of being an undercover police officer "setting [Defendant] up" to be arrested. (*Id.*).  Defendant retrieved a four-foot-long, one-inch-thick plastic pole from his bedroom and struck Scott multiple times with it. (*Id.*).  The blows were very painful, and Scott feared for his life. (*Id.*).  Scott fell and blocked the blows with his arms and hands, eventually managing to get up and retreat to his bedroom. (*Id.*).  He thought his arm was broken. (*Id.*).  He retrieved a baseball bat in his bedroom for defense and waited there with the door closed. (*Id.*).  After several minutes, he opened the door and saw Defendant standing in the hall next to a shotgun with a shortened barrel. (*Id.*).  Scott raised his hands and said, "wow, what's with the shotgun?" (*Id.*).  Defendant said, "just in case you want to try your luck." (*Id.*).  Defendant picked up the shotgun and loaded it, and Scott went back into his bedroom, where he remained until he heard Deputy Brinson knock on the door. (*Id.*).  During this conversation, Deputy Dunham observed Scott's injuries as REMSA personnel treated him. (*Id.*).  Scott's left elbow was swollen and red, and his left arm and hand had multiple red abrasions consistent with having been struck with a rod or pole. (*Id.*).  Scott's left knee was also red and swollen, and he had a red abrasion on his back similar to those on his arm. (*Id.*).

Because Scott's statements and Deputy Dunham's observations were not the fruit of any violation of Defendant's rights, they need not be suppressed.

### E.      Deputy Dunham's Further Questions to Defendant

Based on the claim of a loaded shotgun in the residence, Deputy Dunham returned to the residence and handcuffed Defendant. (*Id.*).  He asked Defendant if he had struck Scott with a pole or rod, and Defendant denied it, saying he would have scratches and bruises if he had been in a fight. (*Id.*).  Defendant refused consent for Deputy Dunham to search the residence for weapons. (*Id.*).  Defendant answered questions as to which bedrooms were his and Scott's. (*Id.* 4–5).  Deputy Dunham asked if he could walk through the kitchen and look at the place where Scott claimed the fight had happened. (*Id.* 5).  Defendant said he could if Defendant came with him. (*Id.*).  They walked through the kitchen to the laundry room and back into the living room where they had previously been. (*Id.*).  From there, Deputy Dunham saw a large multi-colored glass smoking pipe on a dresser. (*Id.*).  Deputy Dunham told Defendant he could see a marijuana pipe, and Defendant said that is why he didn't want Defendant to search the residence. (*Id.*).  Deputy Dunham walked to the doorway and observed a clear plastic rod next to Defendant's bed consistent with the description Scott had given him. (*Id.*).

The Court will exclude the statements Defendant made concerning the altercation while handcuffed.  A reasonable person in Defendant's position would not have felt free to leave at that point, and questions concerning the altercation were reasonably likely to elicit incriminating responses.  The statements, however, have no evidentiary "fruit" to exclude. *See Or*, 470 U.S. at 306–08.  The Court will not exclude the evidence of the glass pipe or the rod.  Deputy Dunham saw these items in plain view after Defendant had consented to Deputy Dunham walking throughout the residence with him.  Even in the absence of consent to search, these items would

have inevitably been discovered.  The police easily had probable cause to arrest Defendant based on Scott's statements, the 911-caller's statements, and the physical evidence of Scott's injuries long before seeing the rod itself, he was bound to have been arrested, and neither Defendant nor anyone else on his behalf would have been permitted to enter the residence and potentially move the evidence before a warrant was obtained and executed.

### F.      Defendant's Arrest

Deputy Dunham placed Scott under arrest for battery with a deadly weapon. (Dunham Police Report 5).  He was placed into a patrol car. (*Id.*).  Defendant's statement at this time that he wanted to call his brother to lock up the residence and that he wanted everyone to leave the residence was not in response to any statement or question by any officer and is therefore not excludable under *Miranda*. (*See id.*).

### G.      Deputy Dunham's Final Conversation with Scott

Scott told Deputy Dunham he was afraid Defendant was going to kill him. (*Id.*).  Deputy Dunham asked where the shotgun was, and Scott said it was probably in Defendant's bedroom. (*Id.*).  It was a double-barreled shotgun with a wooden stock, and it appeared to have been sawed off. (*Id.*).  Scott was then transported to Renown (hospital). (*Id.*).  Because Scott's statements were not the fruit of any violation of Defendant's rights, they need not be suppressed.

### H.      The Search of the Residence

Defendant was taken to the Washoe County Detention Facility and booked. (*Id.*).  A background check on Defendant revealed that he was a felon (and therefore could not legally possess a firearm). (*Id.*).  Deputy Dunham contacted Deputy District Attorney Kevin Naughten to request a telephonic search warrant. (*Id.*).  Judge Chris Wilson granted a search warrant at 5:38 a.m. (*Id.*).  A transcript of the verbal search warrant application indicates that Deputy

Dunham testified that he had probable cause to believe that Defendant had committed battery with a deadly weapon, felon in possession of a firearm, and possession of drug paraphernalia and controlled substances at the residence. (*See* Tr. 4:19–5:8, ECF No. 18-1, at 14).  The evidence recounted in the application (Scott's statements, his injuries, and the marijuana pipe), even excluding evidence of the plastic rod itself, was sufficient to provide probable cause that the crimes had occurred. (*See id.* 5:12–7:13).  The warrant identified the address of the residence and the things to be seized ("a pole, a shotgun, a bong, and/or other indicia of drug paraphernalia"). (Warrant, ECF No. 18-1, at 26).  The Court finds that the warrant was valid.  The warrant was supported by probable cause based on lawfully obtained evidence, issued by a neutral and detached magistrate, and sufficiently described the place to be searched and the things to be seized.

Deputy Dunham executed the search warrant with Deputies Cross and Sanford and Sergeant Hippert. (Dunham Police Report 5).  In Defendant's bedroom, Deputy Dunham found the pipe on a dresser and a loaded 12-guage shotgun with a shortened barrel and a .22 caliber rifle in the closet. (*Id.*).  Deputy Cross found a box of 30-06 ammunition in a dresser drawer. (*Id.*).  Deputy Sanford found a barrel that appeared to have been sawed off of the shotgun. (*Id.*). Deputy Sanford found another glass pipe with residue consistent with a pipe used to smoke methamphetamine. (*Id.*).  The Court will not exclude any of this evidence.  Deputy Dunham returned to the jail and had Defendant booked on two counts of being a prohibited possessor of a firearm, one count of possessing a short-barreled shotgun, and one count of possessing drug paraphernalia. (*Id.* 6).

///

///

1

## I.    Defendant's Interrogation

A video of Defendant's December 31, 2015 interrogation has been submitted in camera. Detective McVickers advised Defendant of his right to remain silent, that anything he said could be used against him in court, that he had the right to speak to an attorney before any questioning, and that if he could not afford an attorney one would be provided for him.  After listing each of these rights, Detective McVickers asked Defendant if he understood, and each time, Defendant answered, "yes."  Detective McVickers then asked him, "With all those rights in mind, are you OK talking to me today?"  Defendant answered, "Yeah."  Defendant notes that the warnings and waiver at the beginning of the January 8, 2016 interrogation were substantially the same.  The Government has conceded that the third warning was insufficient, because Defendant was not informed of his right to counsel *during* questioning as opposed to simply *before* questioning. *See United States v. Noti*, 731 F.3d 610, 614 (9th Cir. 1984).  The Government therefore concedes that the statements made are not admissible as substantive evidence.  The Government argues, however, that the statements may be admissible as impeachment evidence on cross-examination if Defendant chooses to testify, because Defendant does not claim the statements were involuntary.  The Court agrees.

///

///

///

///

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Suppress (ECF No. 18) is GRANTED IN PART and DENIED IN PART.  Defendant's statements in response to questions concerning the altercation between Defendant and Scott made while Defendant was handcuffed will be excluded at trial.  Defendant's statements during the December 31, 2015 and January 8, 2016 interrogations will be excluded at trial, except as used for impeachment purposes on potential cross-examination.  The motion is otherwise denied.

IT IS SO ORDERED.

Dated this 17th day of October, 2016.

_____
ROBERT C. JONES
United States District Judge